UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,       :
               :       **MEMORANDUM & ORDER**
       -against-          :       16-cr-131 (DLI)
               :
RAFAEL ANTONIO FABIAN,       :
               :
          Defendant.   :
------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

On August 15, 2019, Rafael Antonio Fabian ("Defendant") was found guilty, after a jury trial, of one count of conspiracy to distribute and possess with intent to distribute 280 grams or more of a substance containing cocaine base, also known as crack cocaine ("Count One"), in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(iii).  *See*, Superseding Indictment, Dkt. Entry No. 62; Jury Verdict, Dkt. Entry No. 181.[1]  On January 15, 2020, Defendant moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29") or, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33 ("Rule 33").  *See*, Mot., Dkt. Entry No. 219.  The Government opposed the motion.  *See*, Opp'n, Dkt. Entry No. 223.  Defendant did not reply.  On September 28, 2020, the Court denied Defendant's motion and indicated that a written opinion would follow.  *See*, Electronic Order dated September 28, 2020.  This Memorandum and Order sets forth the reasons why Defendant's motion is denied in its entirety.

## BACKGROUND

A jury trial was held from August 6 to August 15, 2019.  In its case in chief, the Government introduced a variety of physical and documentary evidence and called fourteen

---

[1] Defendant was acquitted of the crimes of conspiracy to distribute and possess with intent to distribute one kilogram or more of a substance containing heroin and five kilograms or more of a substance containing cocaine.  *See*, Jury Verdict.

witnesses, including six law enforcement agents who investigated Defendant and his co-conspirators, expert witnesses in the fields of forensic chemistry, drug trafficking, and cellular site location analytics, and two of Defendant's co-conspirators, Jose Nunez ("Nunez")[2] and Carlos Suriel ("Suriel")[3] as cooperating witnesses.  Defendant did not present a case.  The Court finds the Government's witnesses credible.  In summary and relevant part, the following evidence was presented at trial.

In 2013, Nunez began to "run errands" for Suriel, delivering narcotics, including cocaine and crack cocaine, to locations throughout New York City, accepting payments, and returning the proceeds to Suriel, often in increments of five or ten thousand dollars.  Trial Transcript ("Tr.") at 72-74, 78-80, 100-03.  That same year, Suriel approached Defendant because Suriel did not want to be "the little guy" and wanted to "[g]row in the sense of being able to be supplied with more drugs and being able to supply others and make more money."  *Id.* at 466.  Defendant agreed to begin supplying Suriel with drugs "on the arm" or "on consignment," meaning on credit, beginning with an initial amount of 500 grams of cocaine.  *Id.* at 463-67.  After Suriel sold that initial amount, he obtained more cocaine from Defendant, gradually increasing the amounts purchased to one kilogram and later to two kilograms.  *Id.* at 470-84.  During this timeframe, Nunez and Suriel obtained powder cocaine, and eventually heroin, from co-defendant Marino Canela ("Canela")[4]

---

[2] Nunez was prosecuted separately under Case Docket No. 16-cr-37 (DLI).  On February 4, 2016, he waived indictment and pled guilty to the only count in the Government's Information, conspiracy to distribute controlled substances.  His sentencing has been held in abeyance pending Defendant's sentencing.

[3] Suriel was indicted in this case along with Defendant.  On July 27, 2017, Suriel pled guilty to Count One of the Superseding Indictment, conspiracy to distribute controlled substances.  On May 26, 2021, Suriel was sentenced to time served and seven years of supervised release.  *See*, Suriel Judgment, Docket Entry No. 245.

[4] Canela was indicted in this case along with Defendant.  On February 25, 2019, Canela pled guilty to a lesser included offense under Count Three of the Superseding Indictment, attempted possession with intent to distribute heroin, in violation of 18 U.S.C. § 2, 21 U.S.C. §§ 846 and 841(b)(1)(A)(i).  *See*, Minute Entry dated February 25, 2019.  His sentencing is pending.

and Defendant personally. *Id.* at 75-77. Canela made deliveries for Defendant in the same way that Nunez made deliveries for Suriel. *Id.* at 124-25.

Between 2013 and 2014, about two or three times a month, Defendant supplied Suriel and Nunez with half to one kilogram of cocaine and one to two kilograms of heroin, meeting them at a "stash house" in Brooklyn where they would prepare the drugs for sale. *Id.* at 95-96, 103-04. The largest amounts that Defendant supplied in a single delivery to Nunez and Suriel were five kilograms of cocaine and two kilograms of heroin. *Id.* at 104-05. The cocaine would be disguised, sometimes hidden in sheets of cardboard, plantains, or cans of beans. *Id.* at 131, 524-26. Defendant also taught Suriel how to cook powder cocaine into crack cocaine. *Id.* at 494-96. After delivery, Suriel would cook the powder cocaine into crack cocaine at the stash house with Nunez and Defendant present. *Id.* at 130-32, 527-33. Suriel and Nunez then would sell the crack cocaine to individual users and drug dealers. *Id.* at 97-98.

Defendant directed Suriel to communicate with him only via Blackberry text messages after advising Suriel that these devices were harder for police to "trace." *Id.* at 142-43, 484-85. Defendant periodically purchased and provided Suriel with the Blackberry devices they used for communication. *Id.* at 485-87. Suriel listed Defendant as "Alofoke Music" in his Blackberry device. *Id.* at 277-78, 671-72. Numerous Blackberry messages between Suriel and Defendant revealed they used code words to describe drugs, including "bon" or "snow white" for cocaine. *Id.* at 673-74, 678-79. Via text, they discussed drug transfers, payments to Defendant, drug prices for downstream consumers, and sources of supply. *Id.* at 676-91. In one exchange, Defendant told Suriel, "if you don't have dollars don't pass it to anyone," meaning that Suriel should not sell drugs to anyone who did not have the money to pay for them, and Suriel replied, "trust me pa no money no honey." *Id.* at 686.

On September 17, 2014, a Drug Enforcement Administration ("DEA") Task Force comprised of DEA agents and New York City Police Department ("NYPD") detectives conducted a controlled buy from Luigi Pulice ("Pulice") by using an informant, which yielded crack cocaine with a net weight of 92.7 grams. *Id.* at 28, 31, 63. Following the sale, DEA agents observed Nunez drive up to Pulice in a Honda Odyssey. *Id.* at 32. Surveillance was established in the area and no arrests were made that day. *Id.* at 32, 35.

On October 23, 2014, the same informant arranged to purchase 300 grams of crack cocaine from Pulice. *Id.* at 35, 559-61. The DEA agents placed the agreed upon sale location under surveillance. *Id.* at 35. To fill the order, Suriel cooked cocaine into crack cocaine at the stash house, and had Defendant and Canela come to the stash house to observe the cooking process so that Defendant would know that Suriel was not "robbing" him during the process. *Id.* at 559-61. When Suriel finished, Nunez collected what he believed to be 300 grams of crack cocaine and left the stash house to deliver the drugs to Pulice. *Id.* at 81, 559-64. Nunez delivered the crack cocaine to Pulice and drove away, but returned after Pulice called him back. *Id.* at 84. Pulice returned the drugs to Nunez, saying "something fishy was going on." [5] *Id.* at 84. After recovering the crack cocaine, Nunez noticed DEA agents following him in a black SUV and attempted to flee, driving through several red lights, and, ultimately, colliding with the black SUV. *Id.* at 84-85. Nunez was arrested and crack cocaine with a net weight of 257.9 grams was recovered from his vehicle, the same Honda Odyssey he had used during the September 17 controlled buy. *Id.* at 36, 68. Following his arrest, Nunez eventually agreed to cooperate with the DEA. *Id.* at 40-41, 86.

---

[5] Pulice eventually was arrested in connection with the facts described herein. He pled guilty before then Chief U.S. Magistrate Judge Steven M. Gold of this Court, to a one-count information charging him conspiracy to distribute and possess with intent to distribute cocaine and cocaine base, which guilty plea this Court accepted on November 19, 2015. *See, United States v. Pulice,* Case No. 15-cr-374, Dkt. Entry No. 13 and Electronic Order Dated November 19, 2015. However, because of his dim medical prognosis after suffering a massive stroke, Pulice never was sentenced and the case against him dismissed by this Court on motion by the Government. *See, Pulice,* Dkt. Entry No. 35.

On February 22, 2016, Suriel was arrested while trying to meet up with Defendant to purchase heroin. *Id.* at 628, 633. Following his arrest, Suriel eventually agreed to cooperate with the DEA. *Id.* at 635-37. However, he did not cooperate at all times. For example, Suriel informed Defendant that he, Canela, and Nunez had been arrested, that the DEA likely was targeting Defendant, and helped convey an offer from Defendant to Nunez to flee to the Dominican Republic and stop cooperating. *Id.* at 156-58, 639-51. At the time of his arrest, DEA agents recovered from Suriel cell phones, including the Blackberry phone he used to communicate with Defendant, about $9,900 in cash, and small amounts of cocaine and marijuana. *Id.* at 269-70, 633. Based on the recovered text messages, agents were able to locate Defendant and arrested him on March 20, 2016. *Id.* at 284-88.

On March 20, 2016, DEA agents observed Defendant driving a vehicle and arrested him after he double parked the car. *Id.* at 285-86. During Defendant's arrest, agents recovered from his car a black satchel containing six cellular phones, including two Blackberry devices, and several pieces of paper, at least one of which appeared to be a "drug ledger." *Id.* at 289-93, 355-58. No drugs were recovered during Defendant's arrest. *Id.* at 387-88.

At trial, the Government introduced a number of exhibits, including Exhibit 204A ("GX 204A"), which was comprised of eight pages containing handwritten notes that were recovered from the black satchel in Defendant's car at the time of his arrest. *Id.* at 354-358. The first page of GX 204A was a paper with "Park Slope Plumbing Supply" printed on the top containing handwritten numbers. *Id.* at 355-56. Suriel testified that it was his handwriting on pages 1, 2, 5, 6, 7, and 8 of GX 204A. *Id.* at 548. Suriel explained that the papers with his handwriting were scrap pieces of paper he used to record amounts owed to him and amounts he owed for narcotics deals. *Id.* at 448-57. Specifically, Suriel testified that page one of GX 204A documented Suriel's

payments to and from various "drug dealers." *Id.* at 745-47.

On August 15, 2019, the jury returned a guilty verdict. *See*, Jury Verdict. The jury found that the Government had proven beyond a reasonable doubt that Defendant participated in a conspiracy involving 280 grams or more of crack cocaine, but not five kilograms or more of cocaine or one kilogram or more of heroin. *Id.* By letter dated August 27, 2019, Defendant filed Rule 29 and Rule 33 motions *pro se* despite being represented by counsel, which the Court denied without prejudice on procedural grounds. *See*, Dkt. Entry No. 202; Electronic Order dated September 6, 2019. After retaining new counsel and obtaining several extensions, Defendant filed the instant motion. *See*, Mot.; Dkt. Entry No. 213; Minute Entry dated November 13, 2019; Electronic Order dated December 17, 2019.

## LEGAL STANDARDS

### I.    Federal Rule of Criminal Procedure 29

A defendant may move for a judgment of acquittal on the ground that the trial evidence was insufficient as a matter of law to support the jury's guilty verdict. *See*, Fed. R. Crim. P. 29 ("Rule 29"). Rule 29 "imposes a heavy burden on the defendant, whose conviction must be affirmed 'if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Cote*, 544 F.3d 88, 98 (2d Cir. 2008) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted)). For a defendant to succeed on its motion, the Court must find that "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Bramer*, 956 F.3d 91, 97 (2d Cir. 2020) (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted). A court's conclusion that "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt[]" must be

based on its consideration of "all of the evidence, direct and circumstantial[.]"  *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (citation omitted).

The court may not "substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury."  *Cote*, 544 F.3d at 99 (internal punctuation and citation omitted).  Instead, the court must give "full play to the right of the jury to determine credibility, and must draw all possible inferences in favor of the government."  *Id.*; *See also*, *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) ("[I]t is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence.") (quoting *Eppolito*, 543 F.3d at 45).  In other words, the court must view the evidence "in the light most favorable to the government[,]" which means "crediting every inference that the jury might have drawn in favor of the government, and recognizing that the government's evidence need not exclude every other possible hypothesis."  *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (internal quotation marks and citations omitted).  However, "specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty."  *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (emphasis omitted).

## II.    Federal Rule of Criminal Procedure 33

Federal Rule of Criminal Procedure 33 ("Rule 33") "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  *United States v. Truman*, 688 F.3d 129, 141 (2d Cir. 2012) (quoting *United States v. Polouizzi*, 564 F.3d 142, 159 (2d Cir. 2009)).  However, "[t]he defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial . . . a district court must find that there is a real concern that an innocent person may have been convicted."  *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation marks and citation omitted).

Indeed, the "ultimate test" is "whether letting a guilty verdict stand would be a manifest injustice." *United States v. Walker*, 974 F.3d 193, 208 (2d Cir. 2020) (citation omitted).  The court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation[,]" and be satisfied that "competent, satisfactory and sufficient evidence in the record supports the jury verdict." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks omitted).  Courts must exercise Rule 33 authority "sparingly" and in "the most extraordinary circumstances[,]" such as where "a district court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice[.]" *Cote*, 544 F.3d at 101 (internal quotation marks omitted).

## DISCUSSION

### I.      Federal Rule of Criminal Procedure 29

Defendant argues that there was insufficient evidence for a reasonable jury to conclude that he joined a conspiracy to distribute crack cocaine.  Mot. at 4-10.  Defendant claims that his conviction should be vacated because he was acquitted on the charges for conspiracy to distribute and possess with the intent to distribute heroin and cocaine, and there was insufficient evidence to show that Defendant had anything more than a buyer-seller relationship with Suriel, who cooked cocaine supplied by Defendant into crack cocaine.  *Id.*  The Government counters that the evidence of Defendant's participation in a conspiracy to distribute crack cocaine was overwhelming in light of his "sales on credit" of cocaine to Suriel, his involvement with Suriel's cooking process, and their common interests in furthering the sale of the cooked crack cocaine.  Opp'n at 10-14.

"The essence of conspiracy is [an] agreement among two or more persons to join in a concerted effort to accomplish an illegal purpose." *United States v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009) (citing *United States v. Bayer*, 331 U.S. 532, 542 (1947)).  To support a drug conspiracy

8

conviction under 21 U.S.C. § 841(b)(1)(A), the Government must prove:  (1) the existence of the conspiracy charged; (2) the defendant's knowledge of the conspiracy; (3) that the defendant intentionally joined the conspiracy; and (4) that the drug type and quantity involved in the conspiracy was reasonably foreseeable to the defendant. *See*, *United States v. Felder*, 760 F. App'x 74, 76-77 (2d Cir. 2019) (citing *United States v. Santos*, 541 F.3d 63, 70-71 (2d Cir. 2008)).  "The drug quantity attributable to a defendant knowingly participating in a drug distribution conspiracy includes (1) transactions in which he participated directly, (2) transactions in which he did not personally participate, but where he knew of the transactions or they were reasonably foreseeable to him, and (3) quantities he agreed to distribute or possess with intent to distribute regardless of whether he ultimately committed the substantive act." *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019) (internal quotation marks and citation omitted).

Over the course of its case in chief, the Government introduced voluminous, overwhelming evidence of the charged conspiracy and elicited detailed testimony from Defendant's co-conspirators, Nunez and Suriel, regarding Defendant's role within it.  The evidence showed that Defendant supplied Suriel and Nunez with wholesale quantities of narcotics, including cocaine, on credit and Suriel sold the cocaine to downstream consumers after converting it to crack cocaine. Suriel's ability to repay Defendant depended upon his ability to sell the large quantities of cocaine he received from Defendant quickly, and Suriel testified that crack cocaine sold more quickly and was more profitable than powder cocaine.  *See*, Tr. at 478-79.

Although Defendant did not sell the crack cocaine that was distributed by other members of the conspiracy, the distribution of at least 280 grams of this drug was reasonably foreseeable to him and, therefore, attributable to him.  *See*, *Pauling*, 924 F.3d at 657.  The quantity of crack cocaine Nunez sold to a DEA informant through Pulice during the September 17, 2014 controlled

buy (92.7 grams) and the amount of crack cocaine recovered during Nunez's arrest on October 23, 2014 (257.9 grams) together amount to more than the statutory minimum of 280 grams of cocaine base.  Tr. at 63, 68.  Suriel testified that Defendant was present on October 23, 2014 when he prepared the crack cocaine that Nunez was to sell to Pulice, and both Suriel and Nunez testified to cooking crack cocaine with Defendant on multiple occasions.  *Id.* at 128-32, 494-99, 528-33, 559-60.  Moreover, both Nunez and Suriel testified that Defendant supplied them with multiple kilograms of powder cocaine that was converted into crack cocaine.  *Id.* at 103-04; 477-84.  Their testimony and the physical evidence recovered by investigators, along with the numerous drug related text messages exchanged between Suriel and Defendant, belie the notion that Defendant could not have foreseen that the powder cocaine he supplied was being cooked to produce crack cocaine for distribution.  Thus, there was sufficient evidence for the jury to find that the quantity of crack cocaine distributed by the members of the conspiracy was reasonably foreseeable to Defendant.

The jury found that the Government did not prove beyond a reasonable doubt that the conspiracy involved one kilogram of heroin or five kilograms of a substance containing cocaine.  *See*, Dkt. Entry No. 181.  Defendant argues that this verdict is inconsistent because Defendant either participated in the entire conspiracy or none of the conspiracy.  Mot. at 9-10.  However, "it is black letter law that [] inconsistency among verdicts does not support vacatur under Rule 29" or "setting aside a verdict . . . under Rule 33."  *United States v. Mack*, 2020 WL 114509, at *5 (S.D.N.Y. Jan. 10, 2020); *United States v. Acosta*, 17 F.3d 538, 545 (2d Cir. 1994).  Moreover, a reasonable jury could find, as they did here, that Defendant's conspiracy involved at least 280 grams of a substance containing cocaine base but not five kilograms or more of cocaine or one kilogram or more of heroin.  *See*, *United States v. Escalera*, 536 F. App'x 27, 31 (2d Cir. 2013)

(affirming conviction and explaining that verdict was not inconsistent as a reasonable jury could find that the defendant distributed more than 50 but less than 500 grams of methamphetamine).

Alternatively, Defendant argues that his conviction should be vacated because the evidence showed that there were multiple conspiracies at issue, none of which included Defendant.  Mot. at 9.  "In the context of narcotics operations . . . even where there are multiple groups within an alleged conspiracy, a single conspiracy exists where the groups share a common goal and depend upon and assist each other, and [the Court] can reasonably infer that each actor was aware of his part in a larger organization where others performed similar roles."  *United States v. Payne*, 591 F.3d 46, 61-62 (2d Cir. 2010) (citation omitted).

Here, Defendant, Suriel, Nunez, and Canela shared a common goal of selling high volumes of narcotics, and each member of the conspiracy depended on the others to achieve that common goal.  As Defendant acquired large quantities of powder cocaine and other drugs, he relied on Canela to transport those drugs, and depended upon and trusted Suriel to sell the drugs and repay him with the proceeds.  Nunez was instrumental in selling the drugs he and Suriel received from Defendant, and Defendant sufficiently felt tied to the conspiracy to attempt to persuade Nunez, through Suriel, to cease cooperating with the Government and flee the country.  *See*, Tr. at 208, 646-47.  Moreover, Nunez's testimony that he "worked for" Suriel, and not Defendant, does not outweigh the overwhelming evidence establishing a single conspiracy.  *Id.* at 133; *See*, *United States v. Vilar*, 729 F.3d 62, 92 (2d Cir. 2013) ("[A] single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more spheres of operation, so long as there is sufficient proof of mutual dependence and assistance.") (citation omitted); *United States v. Pierce*, 785 F.3d 832, 845 (2d Cir. 2015) ("[The Second] Circuit has gone quite far in finding single conspiracies in narcotics cases.") (quoting *United States v.*

*Bertolotti*, 529 F.2d 149, 154 (2d Cir. 1975)).

Defendant argues that only a "buyer-seller" relationship existed between Defendant and Suriel, which does not support a conspiracy charge.  Mot. at 7-8.  "The buyer-seller exception is a narrow one:  it stands only for the proposition that the mere purchase and sale of drugs does not, without more, amount to a conspiracy to distribute narcotics."  *United States v. Dove*, 884 F.3d 138, 151 (2d Cir. 2018) (internal quotation marks and citation omitted).  "[M]ere awareness on the part of the seller that the buyer intends to resell the drugs is not sufficient to show that the seller and the buyer share a conspiratorial intent to further the buyer's resale."  *United States v. Beniquez*, 790 F. App'x 238, 240-41 (2d Cir. 2019) (quoting *United States v. Parker*, 554 F.3d 230, 235 (2d Cir. 2009)).  The buyer-seller exception does not insulate "either the seller or buyer" from conspiracy liability "if the evidence supports a finding that they shared a conspiratorial purpose to advance other transfers, whether by the seller or by the buyer."  *United States v. Lyle*, 919 F.3d 716, 737 (2d Cir. 2019) (quoting *United States v. Rojas*, 617 F.3d 669, 674 (2d Cir. 2010)).  A court may consider factors including prolonged cooperation between the parties, a level of mutual trust, standardized dealings, sales on credit, and the quantity of the drugs involved.  *See*, *Dove*, 884 F.3d at 151 (citing *United States v. Brock*, 789 F.3d 60, 63 (2d Cir. 2015)).

Consideration of each of these factors supports the conclusion that Defendant was engaged in a narcotics conspiracy with Suriel, Nunez, Canela, and others.  Large quantities of illegal drugs, including cocaine, were exchanged numerous times among the co-conspirators, and Defendant's willingness to supply Suriel with narcotics valued in the tens of thousands of dollars or more, on credit, bespeaks significant trust between the two.  Tr. at 464-67.  Defendant's communications with Suriel, which referenced Defendant's advice regarding drug sales to other buyers, were so probative of the conspiracy that Defendant regularly supplied Suriel with new Blackberry phones

in order to evade detection by law enforcement. *Id.* at 484-87, 686. These individuals established a practice of meeting at the stash house to transfer drugs and to prepare them for sale to other buyers, which involved Suriel cooking Defendant's cocaine into crack cocaine, often in his presence. *Id.* at 130-32, 528-33. The extent of cooperation and mutual dependence proven by the Government shows that Defendant's conspiracy conviction did not rest upon a simple "buyer-seller" relationship.

Finally, Defendant complains that the jury was not instructed that a "buyer-seller relationship is insufficient to constitute conspiracy." Mot. at 8. Defendant does not provide any supporting precedent requiring such an instruction and does not claim that he requested this instruction at trial. The Government failed to address this point in its opposition. Indeed, as Defendant did not request this specific jury instruction he has waived any objection to the Court not having so instructed the jury. *See*, Fed. R. Civ. P. 51; *Morse v. Fusto*, 804 F.3d 538, 551-52 (2d Cir. 2015).

In any event, even if it was error not to give the jury a "buyer-seller" instruction, such error was harmless. As discussed above, the evidence that Defendant was involved in a wider ranging drug distribution conspiracy and not just a buyer-seller relationship with Suriel was overwhelming. Notably, the Court advised the jury that "[a] conspiracy to commit a crime is an entirely separate and different offense from the underlying federal crime that the conspirators intended to commit which the law refers to as the substantive crime." Tr. at 1103. The Court also advised the jury as to the elements of a conspiracy, including that Defendant must be aware of some of the purposes of the unlawful agreement and join with the intent to further those purposes. *Id.* at 1110-13. Moreover, a buyer-seller instruction is not required in every conspiracy case. *See*, *United States v. Colella*, 637 Fed. Appx. 625, 628 (2d Cir. 2015) (affirming trial court's refusal to give buyer-

seller instruction to the jury); *Rojas*, 617 F.3d 669, 675 (2d Cir. 2010) ("we do not reach the question of whether defendant was entitled to [a buyer-seller] instruction"); *United States v. Hoyte*, 330 Fed. Appx. 248, 250 (2d Cir. 2009) ("The district court did not plainly err in concluding that no such [buyer-seller] instruction was necessary in light of the evidence presented.").  Here, a buyer-seller instruction was not necessary considering the Court's instructions to the jury and the overwhelming evidence that Defendant was engaged in more than a mere drug sale to Suriel.

After reviewing the evidence in its totality, in the light most favorable to the Government, the Court finds that a rational trier of fact could have determined that the essential elements of conspiracy to distribute crack cocaine were established by the Government beyond a reasonable doubt.  Accordingly, Defendant's Rule 29 motion is denied.

## II.     Federal Rule of Criminal Procedure 33

Defendant's Rule 33 motion is grounded in a claim of ineffective assistance of counsel. Defendant argues that his trial counsel was ineffective in failing to call Jose Almonte, Defendant's brother-in-law, as a witness to rebut Suriel's testimony regarding page one of GX 204A.  Mot. at 10-13; Fabian Aff., Ex. B, Dkt. Entry No. 219-2.  Defendant claims that he informed his trial counsel of the substance of Almonte's anticipated testimony and his willingness to testify, but that trial counsel never spoke with Almonte or called him as a witness.  Almonte Aff. at ¶¶ 5-8; Fabian Aff. at ¶¶ 3-5.  The Government argues that trial counsel thoroughly cross-examined Suriel about, *inter alia,* page one of GX 204A, and that choosing not to call Almonte likely was a strategic decision since Almonte may have known incriminating information about Defendant.  Opp'n at 20-21.  The Government further contends that Almonte's testimony would have had minimal impact since Suriel testified to having created other similar ledgers, which the Almonte Affidavit did not address.  *Id.* at 21-22.

To succeed on a claim of ineffective assistance of counsel, a defendant must show: (1) that "his attorney's performance 'fell below an objective standard of reasonableness' in light of 'prevailing professional norms,'" and (2) "'affirmatively prove prejudice' arising from counsel's allegedly deficient representation." *United States v. Caracappa*, 614 F.3d 30, 46 (2d Cir. 2010) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 693 (1984)).  Although a defendant must satisfy both prongs to obtain relief, the Supreme Court has stated that "there is no reason for a court deciding an effective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

Courts reviewing an ineffective assistance of counsel claim "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound [legal] strategy." *Id.* at 689 (internal quotation marks and citation omitted).  Courts must "be watchful to eliminate the distorting effects of hindsight." *Brown v. Greene*, 577 F.3d 107, 110 (2d Cir. 2009) (internal quotation marks and citations omitted).  An attorney's decision not to call a particular witness is "typically a question of trial strategy" that courts are "ill-suited" to second guess. *United States v. Blanco*, 811 F. App'x 696, 702 (2d Cir. 2020) (quoting *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998)); *See also*, *United States v. DiTomasso*, 932 F.3d 58, 60-70 (2d Cir. 2019) ("decisions not to call specific witnesses -- even ones that might offer exculpatory evidence -- [are] ordinarily not viewed as a lapse in professional representation") (internal quotation marks and citation omitted).  Thus, "[c]ourts applying *Strickland* are especially deferential to defense attorneys' decisions concerning

15

which witnesses to put before the jury." *Lopez v. United States*, 792 F. App'x 32, 38 (2d Cir. 2019) (quoting *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005)).

Despite Defendant's arguments, it is unclear from the Almonte Affidavit whether he is claiming authorship of page one of GX 204A.  His affidavit merely states that: (1) he authored "a plumbing-supply invoice" that was admitted at trial by an unidentified "cooperating witness;" (2) the invoice is unrelated to drug trafficking; (3) and Almonte would be willing to submit to a handwriting analysis.  Almonte Aff., Ex. A, Dkt. Entry No. 219-1.  The Almonte Affidavit does not annex or identify the document in question by exhibit or Bates number, and does not otherwise specifically reference GX 204A.  However, even assuming Almonte would claim authorship of page one of GX 204A, Defendant's argument fails on the merits.

While it is possible that Almonte's testimony could have led the jury to view Suriel's testimony with more skepticism, Defendant's trial counsel may have calculated that calling Almonte as a witness would not have been advantageous overall.  As the Government points out, Almonte is Defendant's relative and, as such, is an interested witness who may have been compelled on cross-examination to testify about topics detrimental to Defendant, including Defendant's sources of income, his frequent travel to the Dominican Republic, and his use of multiple vehicles and phones.  Opp'n at 21.  Counsel was not ineffective by avoiding this line of questioning, which could have harmed Defendant.  *See*, *e.g.*, *United States v. Best*, 219 F.3d 192, 202 (2d Cir. 2000) (counsel was not ineffective by failing to call character witnesses when doing so would have "opened the door" for the Government to obtain damaging testimony).

Trial counsel may have concluded that calling one witness for questioning about one page of one exhibit after an exhaustive presentation by the Government would have been ineffective and counterproductive.  Defendant does not claim that Almonte would have testified as to the other

pages of GX 204A and the notes made thereon.  Thus, Suriel's testimony that most of the papers contain his notes regarding drug debts would have been bolstered by Almonte's targeted testimony.  Notably, it would have supported further the link between Suriel and Defendant for, if Almonte created the invoice for Defendant, how did Suriel obtain it to make notes on it?  This provides a possible justification for trial counsel's alleged failure or reluctance to speak with Almonte.  *See*, *Bobby v. Van Hook*, 558 U.S. 4, 11-12 (2009) (counsel's failure to interview potential witnesses not ineffective where potential testimony would not have added significant value to overall defense).

Instead, trial counsel attacked Suriel's credibility through cross-examination.  Trial counsel's questioning revealed that Suriel failed to recall specific details regarding the notes that he testified were his, such as the individuals associated with the dollar amounts that Suriel had written down.  Tr. at 745-47.  Suriel's motivations and credibility were called into question through Suriel's admission that: (1) he had a personal interest in testifying, *i.e.,* that he could benefit under his cooperation agreement with the Government by testifying; (2) he lied to investigators when he first met with them; and (3) he violated the terms of his cooperation agreement and bail conditions by continuing to sell narcotics after his arrest.  *Id.* 727-29, 735-39.  Trial counsel's strategic decision was well within the "wide range of professionally competent assistance" that is sufficient to satisfy Defendant's right to counsel under the Sixth Amendment to the Constitution.  *Strickland*, 466 U.S. at 690; *See also*, *Samet v. United States*, 559 F. App'x 47, 50 (2d Cir. 2014) ("decision [not to call certain witnesses] was reasonable" where counsel endeavored to "undermine the government's witnesses through cross-examination rather than through rebuttal experts."). Accordingly, Defendant has not shown that his trial counsel's performance fell below an objective

standard of reasonableness.

Even assuming trial counsel erred in failing to call Almonte, Defendant has not demonstrated resulting prejudice. *See*, *Caracappa*, 614 F.3d at 46. Suriel's statements were corroborated by Nunez, who testified at length as to the Defendant's role within the crack cocaine distribution conspiracy. Suriel's testimony was corroborated and amplified by testimony from law enforcement agents, expert witnesses, and dozens of pieces of physical evidence, including incriminating text messages between Suriel and Defendant, and the recovery of an amount of cocaine base in excess of the applicable statutory minimum of 280 grams. In other words, any error in relation to Almonte was harmless in light of the overwhelming evidence presented at trial. For similar reasons, an evidentiary hearing would "add little or nothing to the [parties'] written submissions" and is not required. *Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001). Accordingly, Defendant's Rule 33 motion is denied.

## CONCLUSION

For the reasons set forth above, Defendant's motion for a judgment of acquittal or, in the alternative, for a new trial is denied in its entirety.


SO ORDERED.

Dated: Brooklyn, New York
        April 11, 2022


                                    /s/
                            DORA L. IRIZARRY
                            United States District Judge